**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| INTERNATIONAL MANAGEMENT ADVISORS LTD., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 1:16-CV-1325<br>) |
| ASM SPORTS GROUP, LLC, and ANDY MILLER, | )<br>) **Jury Trial Demanded**<br>) |
| Defendants. | ) |

**COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT**

International Management Advisors, Ltd. ("IMA"), by counsel, for its Complaint for Damages against Defendant, ASM Sports Group, LLC ("ASM Sports") and Andy Miller ("Miller") (collectively, "Defendants"), alleges and asserts as follows:

**PARTIES, JURISDICTION AND VENUE**

1. IMA is an Ohio limited liability company located at 1360 East 9th Street, Suite 86, Cleveland, OH 44114. IMA has one member, Kurt Schoeppler ("Schoeppler"), who is a citizen of Ohio.

2. ASM Sports is a New Jersey limited liability company headquartered at 223 South Dean Street, Englewood, NJ 07631. ASM Sports has one member, Miller, who is a citizen of New Jersey. Miller is the President of ASM Sports.

3. This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists between IMA and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

1

4. ASM Sports has an office at 320 North Park Avenue, Indianapolis, IN 46202, which is occupied by ASM Sports' General Counsel, J.R. Hensley ("Hensley"), an active participant in the conduct described below.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims in this action occurred within this district.

## GENERAL ALLEGATIONS

6. IMA is a sports agency and investment advisory firm located in Cleveland, Ohio. IMA acts as the agent and / or financial advisor for several NBA players. Schoeppler is the President of IMA and is a licensed sports agent.

7. ASM Sports also provides sports agency and investment advice for NBA players. Miller, ASM Sports' President, is a licensed sports agent in the State of Indiana, registered with the Indiana Attorney General's Office. Hensley, ASM Sports' General Counsel, is also a licensed sports agent in the State of Indiana, registered with the Indiana Attorney General's Office.

8. In late 2013 and early 2014, IMA and Schoeppler began to develop a relationship with NBA prospect Jarell Martin through his advisors while Martin was a freshman at Louisiana State University ("LSU").

9. Around that same time, IMA and Schoeppler also began to foster a relationship with K.J. McDaniels, then at Clemson University.

10. In April 2014, IMA hired Christian Dawkins ("Dawkins") as Executive Director of Sports and Entertainment. A true and accurate copy of the Employment Agreement between IMA and Dawkins is attached as Exhibit 1.

11. Dawkins was hired to assist IMA in developing relationships with future NBA players such that the players would select IMA to serve as their agent and / or financial advisor during and after their NBA playing career. Dawkins was paid an annual salary and also provided reimbursement for expenses incurred while traveling and pursuing prospects.

12. The Employment Agreement with Dawkins contained both a non-solicitation clause in paragraph 6 as well as a non-competition clause in paragraph 9. Paragraph 6 states:

> <u>Representation of Existing and Prospective Clients, Properties, and Customers</u>. During the Employee's employment with the Company, the Employee will not solicit nor represent any client, property, or customer on behalf of anyone other than the Company. For the period of two years following the end of Employee's employment with the Company, Employee will not directly or indirectly solicit or represent as a client, on Employee's own behalf or on behalf of another, or be employed by, any person or organization which: (i) was a client of the Company within eighteen months next preceding the end of Employee's employment with the Company and/or was a client with whom Employee had dealings while Employee was associated with the Company or was a client with whom employees reporting to Employee had dealings while Employee was associated with the Company; or (ii) was a prospective client of the Company who was actively solicited as such within the twelve months next preceding the end of Employee['s] employment with the Company, and further, Employee or Company employees reporting to Employee, participated in such solicitation.

In addition, paragraph 9 states:

> <u>Restrictions re Certain Companies</u>. For the twelve month period next following the end of your association with the Company, (regardless of the reason for the end of that association and regardless of whether it was by your choice or that of the Company), you will not, directly or indirectly, perform services in the nature of the services you performed for the Company including but not limited to the solicitation, representation or financial management of professional athletes or prospective professional athletes on behalf of any and all affiliates and/or successors of entities that are, or may be associated with the representation, management, marketing, consulting or other professional services for professional athletes including specifically, but not limited to, Creative Artists Agency, Relativity Sports, ASM Sports, Excel Sports, Wasserman or Priority Sports or any other registered agent with the NBA or NFL Players Associations or any company or affiliate of any company employing NBA or NFL registered agents. You agree not to be employed by any persons or companies representing or seeking to represent prospective or current professional basketball or American football

players for contract, marketing or financial services for the twelve month period next following the end of your association with the company.

Exhibit 1.

13. IMA insists on employment agreements with restrictive covenants because IMA invests a significant amount of money and time developing relationships with NBA prospects. Those relationships are critical to earning the trust of an NBA prospect and ultimately representing the player as his agent and / or financial advisor.

14. Throughout 2014 and early 2015, while employed by IMA, Dawkins spent a considerable amount of time developing a relationship with Jarell Martin, K.J. McDaniels and other prospects.

15. Dawkins also liberally used IMA's credit card to charge expenses allegedly incurred in conjunction with his pursuit of Jarell Martin, K.J. McDaniels and other prospects.

16. Toward the end of 2014, Schoeppler began hearing rumors that Dawkins was steering prospects toward ASM Sports rather than IMA for agent representation.

17. In mid-December 2014, Schoeppler and Miller spoke on the phone about Dawkins.

18. During that call, Schoeppler advised Miller that Dawkins was his employee and was subject to a non-compete provision that specifically named ASM Sports as a company for which Dawkins could not work within the one-year non-competition period.

19. By January 2015, it became apparent that Dawkins was actually representing ASM's interests, not IMA's, when interacting with prospects, and he could no longer be trusted as the Executive Director of Sports and Entertainment. Thus, IMA began discussions with Dawkins to terminate his employment.

20. On January 14, 2015, due to concerns that ASM Sports may seek to induce and assist Dawkins in the violation of his Employment Agreement, Schoeppler sent an email to Miller with a copy of Dawkins' Employment Agreement attached. Miller responded later that same day indicating that he would not be a "participant unless there's a mutual agreement."

21. On January 15, 2015, Schoeppler also sent a copy of Dawkins' Employment Agreement to Hensley, ASM Sports' General Counsel, per Hensley's request.

22. Hensley reviewed the Employment Agreement and advised Dawkins what a release needed to say to permit Dawkins to work for ASM. Specifically, Hensley told Dawkins that paragraph 6 of the Employment Agreement must be modified such that it would apply to financial advisory services only.

23. During negotiations to end Dawkins' employment, Dawkins requested a release from the restrictive covenants in the Employment Agreement. Dawkins advised Schoeppler of Hensley's legal opinion that paragraph 6 of the Employment Agreement must be modified "in order for them [ASM Sports] to pay me."

24. IMA calculated that Dawkins owed IMA $61,700 for improper expenditures while employed with IMA.

25. IMA and Dawkins agreed that Dawkins would sign a Promissory Note for $61,700 and, in return, IMA would release Dawkins from certain non-competition covenants in paragraph 9 of the Employment Agreement.

26. However, IMA remained steadfast that the non-solicitation covenants in paragraph 6 would not be modified.

27. In February 2015, Schoeppler sent Dawkins two documents via email: (1) a document entitled Termination of Employment and Amendment of Employment Agreement

Regarding Certain Companies ("Termination Agreement"), and (2) a Promissory Note for $61,700.  A true and accurate copy of the Termination Agreement is attached as Exhibit 2 and the Promissory Note as Exhibit 3.  Both documents were included in the same PDF attachment with a notation in the email that read, "Here's the note and release."

28. The Termination Agreement provided that Dawkins was terminated from his employment on January 15, 2015.  IMA also agreed to delete ASM Sports from the list of prohibited companies in the non-competition clause in paragraph 9, and IMA acknowledged that Dawkins was "free to perform services on beha[lf] of ASM Sports as otherwise prohibited by Paragraph 9."  Exhibit 2.  However, the non-solicitation covenants in paragraph 6 remained unchanged in the Termination Agreement: "The employment agreement, including the restrictions of Paragraph 6, remains in full force and effect with the exception of the deletion of ASM Sports in Paragraph 9."  Id.

29. On February 24, 2015, Dawkins electronically signed the Termination Agreement, but did not sign the Promissory Note.  Dawkins claimed he was unable to sign the Promissory Note but that he would do so and fax it to IMA.

30. Dawkins subsequently repeated his promises to sign the Promissory Note, but he never did.

31. The consideration for the Termination Agreement was the Promissory Note, which Dawkins refused to sign.  Thus, the Termination Agreement is of no force or effect.  And even if the Termination Agreement is somehow valid, it did not affect Dawkins' obligation in paragraph 6 to not "solicit or represent as a client … any person or organization which … was a prospective client of the Company who was actively solicited as such within the twelve months preceding the end of Employee['s] employment with the Company."  Exhibit 1.

32. Following his termination from IMA, Dawkins was hired by ASM Sports for a position substantially the same to Dawkins' position with IMA.

33. Defendants hired Dawkins despite full awareness of Dawkins' Employment Agreement and the non-competition covenant in paragraph 9 that specifically prohibited Dawkins from working for ASM Sports.

34. Moreover, and more troublesome, Miller actively encouraged Dawkins to breach the non-solicitation clause in paragraph 6 of the Employment Agreement.

35. Dawkins had spent the nine months he was employed with IMA pursuing a business relationship with Jarell Martin, K.J. McDaniels, and other NBA prospects. Immediately upon Dawkins' employment with ASM Sports, Miller encouraged Dawkins to use the relationships he had formed with NBA prospects – during 2014 when Dawkins was an IMA employee – to convince them to sign with ASM Sports.

36. Defendants were fully aware of the terms of the Employment Agreement, having had a copy provided to Miller and Hensley on January 14, 2015.

37. Nevertheless, Defendants hired Dawkins and encouraged him to solicit Jarell Martin, K.J. McDaniels, and others in clear violation of paragraph 6 of the Employment Agreement.

38. By actively encouraging Dawkins to solicit players with whom he had developed a relationship with while on IMA's payroll, Defendants disregarded the advice of ASM's own General Counsel, Hensley, who had stated that the non-solicitation clause in paragraph 6 of the Employment Agreement must be modified for Dawkins to work for ASM Sports.

39. In March 2015, Jarell Martin signed with ASM Sports, meaning ASM Sports (and Miller specifically) would serve as Jarell Martin's agent and represent him in all contract negotiations and endorsement deals.

40. In March 2016, K.J. McDaniels also signed with ASM Sports.

41. Dawkins played an active and critical role in recruiting Jarell Martin and K.J. McDaniels to join ASM Sports.

42. In a phone call on March 31, 2015, Dawkins bragged to Schoeppler that Jarell Martin has signed with ASM Sports based entirely on the fact that Dawkins told him to do so. Dawkins said that Jarell Martin had never even met Miller in person prior to signing with ASM Sports.

43. On June 26, 2014, K.J. McDaniels was drafted in the second round of the NBA draft by the Philadelphia 76ers with the 32nd overall pick. On June 25, 2015, Jarell Martin was drafted in the first round by the Memphis Grizzlies with the 25th overall pick.

44. As agent of record for Jarell Martin and K.J. McDaniels, ASM Sports has received compensation for contracts and endorsement deals negotiated for these players, and will continue to do so as long as the representation continues. But for Dawkins' breach of the Employment Agreement, ASM Sports would not have signed these players.

45. Miller has a troubling history of engaging in similar conduct. In 2010, Miller was found liable in an arbitration for interfering with another agent's relationship with an NBA player by reaching a representation agreement with him while the player was still under contract with another agent. And in 2002, Miller was found liable for a $4.6 million judgment in connection with conspiring to secretly sign clients to his own company while employed by another. Two of the players whom Miller was found liable for stealing, Kevin Garnett and

Chauncey Billups, are touted on ASM Sports' website as examples of "some of the top names in the NBA" that have been represented by ASM Sports.

46. Defendants have also been the direct beneficiary of Dawkins' fraud, and have willingly accepted those benefits.

47. While acting as an employee of ASM, Dawkins stole the credit card number for an American Express card belonging to IMA issued to Elfrid Payton, a client of IMA.

48. Dawkins used the stolen credit card number to establish an account with Uber, and from February 2015 through May 2016, Dawkins charged $42,722 to the Uber account.

49. Dawkins incurred the Uber charges while he was an employee of ASM, and the charges were for ASM's benefit as Dawkins was recruiting NBA prospects for ASM.

50. But for Dawkins' fraudulent and criminal misuse of the IMA-issued credit card to establish the Uber account, ASM would have had to pay the $42,722 in Uber charges incurred by their employee, Dawkins.

## COUNT I – TORTIOUS INTERFERENCE WITH CONTRACT

51. Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

52. The Employment Agreement between IMA and Dawkins was a valid and enforceable contract.

53. Defendants were fully aware of the existence of the Employment Agreement. In December 2014, Schoeppler advised Miller of the Employment Agreement on the phone, and on January 14, 2015 Schoeppler sent Miller a copy of the Employment Agreement. Schoeppler also sent a copy of the Employment Agreement to Hensley on January 15, 2015 in response to Hensley's request.

54. Defendants knowingly and intentionally induced Dawkins to breach his Employment Agreement. Defendants induced Dawkins to breach paragraph 9 of the Employment Agreement by employing him within one year of his termination by IMA.

55. In addition, Defendants induced Dawkins to breach paragraph 6 of the Employment Agreement by using Dawkins to solicit Jarell Martin, K.J. McDaniels, and others to sign with ASM Sports.

56. Defendants' interference was malicious because it was not justified. Defendants used wrongful means by encouraging Dawkins to breach his duty of loyalty to his employer, IMA, by surreptitiously working for ASM Sports' benefit instead of IMA's. IMA spent nearly nine months compensating Dawkins and paying his expenses to develop relationships with NBA prospects and players, only to have that investment used for the benefit of ASM Sports instead of IMA despite clear language in the Employment Agreement prohibiting such conduct.

57. Defendants were fully aware of Dawkins' employment with IMA and the terms of the Employment Agreement, but nevertheless encouraged and assisted Dawkins in breaching both his duties of loyalty and contractual duties to IMA.

58. IMA has been damaged as a result of Defendants' tortious conduct in that Defendants' reap the financial benefit of representing Jarell Martin, K.J. McDaniels and others, representation that was obtained in large part due to Dawkins' influence and recruiting.

59. Miller is personally liable for the tortious conduct because he personally engaged in it while acting as an officer of ASM.

### COUNT II – TORTIOUS INTERFERENCE WITH A PROSPECTIVE BUSINESS RELATIONSHIP

60. Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

61. Defendants interfered with IMA's prospective business relationship with Jarell Martin and K.J. Martin (and perhaps others), and also interfered with IMA's business relationship with its employee, Dawkins.

62. IMA was in active pursuit of business with Jarell Martin, K.J. McDaniels, and others through Schoeppler's own efforts and by hiring Dawkins in April 2014 to develop a deeper relationship. With respect to Dawkins, a business relationship was already in existence as he was an employee of IMA.

63. Defendants were aware of IMA's pursuit of Jarell Martin and K.J. McDaniels, and were well aware that Dawkins was IMA's employee.

64. Defendants intentionally and maliciously interfered with IMA's prospective business relationship with Jarell Martin and K.J. McDaniels, as well as IMA's employment relationship with Dawkins, without justification or excuse. Defendants convinced Dawkins to breach his duty of loyalty to his employer, IMA, and actively assisted Dawkins in breaching his Employment Agreement during and after his employment with IMA.

65. But for Defendants' interference with IMA's prospective relationship with Jarell Martin and K.J. McDaniels and actual business relationship with Dawkins, IMA had a reasonable probability of signing Jarell Martin and K.J. McDaniels due to the investment IMA made in developing Dawkins' relationship with the players.

66. Dawkins was the linchpin to both players signing with ASM Sports.

67. IMA would have continued to receive the benefit of Dawkins' services had Defendants not encouraged and assisted Dawkins in breaching his duty of loyalty and Employment Agreement.

68. IMA has been damaged as a result of Defendants' tortious interference with prospective and actual business relationships in that it has lost the business / employment relationship of Dawkins, and the prospective business relationship with Jarell Martin, K.J. McDaniels and potentially others.

69. Miller is personally liable for the tortious conduct because he personally engaged in it while acting as an officer of ASM.

### COUNT III – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY / DUTY OF LOYALTY

70. Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

71. As an employee of IMA, Dawkins owed IMA a fiduciary duty and a duty of loyalty to act in IMA's best interest.

72. Defendants interacted with Dawkins while he was still IMA's employee and encouraged him to act in ASM Sports' interest, to the detriment of IMA. Ultimately, Dawkins' breaches of loyalty – fostered by Defendants – led to Dawkins' termination from IMA.

73. ASM Sports then immediately swooped in, hired Dawkins, and encouraged Dawkins to breach the non-solicitation terms of the Employment Agreement despite Hensley's legal advice that modification to the non-solicitation clause was needed.

74. Dawkins breached his fiduciary duty and duty of loyalty while employed by IMA by steering NBA prospects to ASM Sports for agency services rather than IMA.

75. Defendants were aware of Dawkins' duty to IMA, and were active participants in, and facilitators of, Dawkins' breach.

76. Dawkins' breaches of fiduciary duty and duty of loyalty caused damage to IMA by depriving IMA of the benefit of its employment relationship with Dawkins and the loss of Jarell Martin, K.J. McDaniels and other prospects as IMA clients.

77. Miller is personally liable for the tortious conduct because he personally engaged in it while acting as an officer of ASM.

### COUNT IV – CIVIL CONSPIRACY

78. Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

79. Dawkins and Miller agreed to engage in concerted action to accomplish a tort. Specifically, Dawkins and Miller agreed that Dawkins would breach his duty of loyalty to IMA while still employed, and then when Dawkins was hired by ASM Sports, Defendants tortiously interfered with Dawkins' Employment Agreement by agreeing that Dawkins should breach the non-solicitation and non-competition clauses in paragraphs 6 and 9.

80. As a result of Defendants' conspiring with Dawkins, Defendants are jointly and severally liable for torts committed by Dawkins, including his breach of fiduciary duty and duty of loyalty.

81. Miller is personally liable for the tortious conduct because he personally engaged in it while acting as an officer of ASM.

### COUNT V – UNJUST ENRICHMENT

82. Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

83. Defendants have received, and continue to receive, a benefit in the form of revenue from their representation of Jarell Martin, K.J. McDaniels, and other prospects guided to ASM Sports by Dawkins.

84. Defendants obtained that revenue through unjust means by inducing Dawkins to breach his duty of loyalty and by tortiously interfering with contracts and business relationships.

85. It would be unjust for Defendants to retain the revenue it improperly obtained, and instead, such revenue should be paid to IMA as damages.

86. Moreover, Dawkins charged $42,722 to an Uber account using an IMA credit card while employed by ASM and while performing services for ASM's benefit.

87. The $42,722 in Uber charges fraudulently billed to IMA should have been expenses paid by ASM.

88. It would be unjust for Defendants to shift to IMA the expense of the Uber charges that were incurred by their employee for their benefit. The $42,722 in fraudulent Uber charges should be paid to IMA as damages.

### COUNT VI – DECLARATORY JUDGMENT

89. Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

90. Pursuant to 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

91. IMA requests a declaration that the Termination Agreement is invalid and unenforceable because the consideration for the agreement – the Promissory Note – was never

executed. Thus, there has been no modification to the non-competition clause in the Employment Agreement and Dawkins' employment by ASM Sports is in direct violation of the Employment Agreement.

92. Moreover, even if the Termination Agreement is deemed valid and enforceable, IMA seeks a declaration that the non-solicitation clause in the Employment Agreement remains unaffected. Nothing in the Termination Agreement purports to modify or eliminate the non-solicitation clause in paragraph 6 of the Employment Agreement. The Court should declare that Dawkins remains bound to the non-solicitation provisions in paragraph 6 of the Employment Agreement, and his breach of that provision – at the behest of Defendants – results in liability.

93. IMA also seeks a declaration that to the extent Defendants receive revenue from ASM Sports' representation of Jarell Martin and K.J. McDaniels on future contracts or endorsement deals, any such revenue should be paid to IMA. Defendants continue to represent Jarell Martin and K.J. McDaniels and will likely continue to receive revenue from that relationship after this litigation is concluded. IMA seeks a ruling that any revenue received by Defendants from any client that Dawkins guided to ASM Sports in violation of the non-solicitation clause in paragraph 6 of the Employment Agreement should be paid to IMA.

WHEREFORE, Plaintiff, International Management Advisors, Ltd., respectfully requests that the Court (1) enter judgment in its favor and against the Defendants, ASM Sports Group, LLC and Andy Miller, for all compensatory damages as established at trial and allowable by law, (2) declare that the Termination Agreement is of no force and effect and that future revenue received by Defendants for any client Dawkins brought to ASM Sports in violation of his Employment Agreement must be paid to IMA, (3) award punitive damages as warranted for

Defendants' tortious conduct, (4) award IMA all costs incurred in connection with this matter, and (5) award all other just and proper relief.

## JURY DEMAND

IMA respectfully requests a jury trial on all issues so triable.

Dated:  May 24, 2016                                        Respectfully Submitted,


/s/ Paul D. Vink
Paul D. Vink, Atty. No. 23785-32
Andrew M. McNeil, Atty. No. 19140-49

BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, Indiana  46204
(317) 684-5000 telephone
(317) 684-5173 facsimile

*Attorneys for Plaintiff, International Management Advisors, Ltd.*