# EXHIBIT H

## AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| INTERNATIONAL MANAGEMENT ADVISORS, LTD., | ) ) ) | Case No. 01-15-0006-6107 |
| Claimant, | ) ) | Ronald H. Isroff |
| -v- | ) ) | |
| CHRISTIAN DAWKINS, | ) ) ) | |
| Respondent. | ) ) ) ) | |

## RESPONDENT CHRISTIAN DAWKINS' MOTION FOR SUMMARY JUDGMENT

SQUIRE PATTON BOGGS (US) LLP
Colin Jennings (0068704)
colin.jennings@squirepb.com
Sean L. McGrane (0091287)
sean.mcgrane@squirepb.com
4900 Key Tower, 127 Public Square
Cleveland, Ohio 44114
Tel: (216) 479-8500
Fax: (216) 479-8780

*Attorneys for Respondent Christian Dawkins*

## PRELIMINARY STATEMENT

Respondent Christian Dawkins worked for Claimant International Management Advisors Ltd. ("IMA") for under a year, earning less than $50,000.  IMA now seeks to limit his employment for more than a year after the conclusion of his employment, despite the fact that IMA expressly amended Mr. Dawkins' employment agreement to delete any applicable restrictive covenants.  IMA's claims should be dismissed.

The undisputed evidence shows that Mr. Dawkins has not breached the governing Employment Agreement, and that the parties expressly contemplated and agreed that Mr. Dawkins was free to work for non-party ASM Sports – a sports agency which provides contract and marketing services to professional basketball players.  Specifically, the Employment Agreement between Mr. Dawkins and IMA, as originally written, contained a provision prohibiting Mr. Dawkins from working for certain companies (including ASM Sports) within the one year period following the end of his employment with IMA.  *See* Exhibit A at ¶ 9.   But Mr. Dawkins and IMA subsequently executed a written amendment to the Employment Agreement which expressly deleted any reference to ASM Sports from the non-compete provision:  "We agree to amend Paragraph 9 and delete the reference to ASM Sports.  *We acknowledge and agree that you are free to perform services on behave [sic] of ASM Sports as otherwise prohibited by Paragraph 9.*"  Exhibit B (emphasis added).  There is no ambiguity about this amendment, as confirmed by a contemporaneous email written by IMA's principal, Kurt Schoeppler: "*I [am] releasing ASM from the non compete.*"  Exhibit C.

The only surviving restriction in the Employment Agreement prohibits Mr. Dawkins from recruiting athletes to ASM Sports for the purposes of providing financial advisory and investment services – the same services which IMA provides to its clients.  Exhibit A at ¶ 6.  But

the Employment Agreement does not at all restrict Mr. Dawkins' ability to recruit athletes to ASM Sports for contract and marketing services – an entirely separate package of services from the financial advisory services offered by IMA.  Here again, Mr. Schoeppler's own words make clear that Mr. Dawkins was free to recruit athletes – including current and prospective clients of IMA – to ASM Sports, so long as ASM Sports did not provide the same financial advisory services provided by IMA: *"I don't want to be an agent.  Andy [Miller, founder of ASM Sports] doesn't want to be a financial advisor.  It shouldn't be a problem in any way for anybody."*  *See* Exhibit C.  Because it is undisputed that Mr. Dawkins has not recruited any athletes to ASM Sports for the purposes of providing financial advisory services – indeed, as Mr. Schoeppler correctly noted in his email, ASM Sports does not even provide such services to its clients – the claims asserted against Mr. Dawkins fail, and the claims should be dismissed in their entirety.

Separately, even if the panel were to conclude that the terms of the Employment Agreement as amended restrict Mr. Dawkins' ability to perform contract and marketing services for current or potential clients of IMA, such a restriction is unenforceable as a matter of Ohio law.  IMA's claims should be dismissed for this separate and independent reason as well.

## FACTUAL STATEMENT

### A.     The relevant parties.

Claimant IMA is a registered investment advisory firm which provides financial and investment services to its clients.  *See* Exhibit D.  Kurt Schoeppler is the principal and sole member of IMA.  *Id.* at Schedule A.  According to its filings with the United States Securities and Exchange Commission, IMA provides "financial planning services" and "portfolio management" for individuals and small business.  *Id.* at Item 5(G); *see also id.* at Item 6 (describing IMA as an "insurance broker" and "accountant or accounting firm").  IMA's clients

- 2 -

are generally professional athletes and its potential clients consist of professional athletes who can generally be identified through public sources such as team roasters and news articles.

Non-party ASM Sports is a sports agency firm which principally provides contract negotiation and marketing services for professional basketball players. *See, e.g.,* www.ASMSports.com/services/contract-negotiation ("ASM Sports' main focus is to negotiate the strongest contracts possible for our athletes. 20 years of contract negotiating experience at the highest levels of basketball."); www.ASMSports.com/services/marketing-endorsements ("ASM Sports has a track record of helping athletes expand their brands beyond the basketball court, working with top global companies to create lasting partnerships."). ASM Sports does not provide investment advisory or portfolio management services to its clients. *See* Accompanying Declaration of Christian Dawkins ("Dawkins Decl.") at ¶ 2. Andy Miller is the founder and president of ASM Sports.

As described more fully below, Christian Dawkins was formerly employed by IMA and is currently employed by ASM Sports. *Id.* at ¶¶ 2-3. Mr. Dawkins is a 23 year old resident of Atlanta, Ga. *Id.* at ¶ . While at IMA, Mr. Dawkins did not acquire any trade secrets. *Id.* at ¶ 3. Further, Mr. Dawkins did not acquire any specialized skill, experience or training while working for IMA. While employed by IMA, Mr. Dawkins recruited athletes to join IMA to for purposes of providing ***financial advisory and investment services***; Mr. Dawkins did not recruit athletes to IMA to receive ***contract and marketing services***. *Id.* at ¶¶ 3-4. Conversely, as an employee of ASM Sports, Mr. Dawkins does not recruit athletes to ASM Sports to receive financial advisory and investment services; Mr. Dawkins only recruits athletes to ASM Sports for the purposes of receiving contract and marketing services. *Id.*

**B.     IMA agrees to remove any restrictions on Mr. Dawkins' ability to work for ASM Sports following his departure from IMA.**

On April 29, 2014, Mr. Dawkins and IMA entered into the Employment Agreement, which was drafted by IMA.  *See* Exhibit A.  The Employment Agreement allowed for either party to terminate the agreement at will and called for Mr. Dawkins to receive an annual salary of $50,000.  *Id.* at ¶¶ 1-2. In addition to provisions relating to disclosure of confidential information (¶ 3) and ownership of intellectual property (¶ 4), the Employment Agreement contains non-solicitation and non-competition provisions (¶¶ 6, 9).

Paragraph 6 of the Employment Agreement purports to limit Mr. Dawkins ability to represent or solicit any clients or prospective clients of IMA for two years.  Paragraph 6 states, in full:

> For the period of two years following the end of the Employee's employment with the Company, Employee will not directly or indirectly solicit or represent a client, on Employee's own behalf or on behalf of another, or be employed by, any person or organization which (i) was a client of the Company within eighteen months next preceding the end of Employee's employment with the Company and/or was a client with whom Employee had dealings while Employee was associated with the Company or was a client with whom employees reporting to Employee had dealings while Employee was associated with the Company; or (ii) was a prospective client of the Company who was actively solicited as such within the twelve months next preceding the end of Employee['s] employment with the Company, and further, Employee or Company employee reporting to Employee, participated in such solicitation.

Exhibit A.

Paragraph 9 of the Employment Agreement is a broad, 12 month non-compete provision that purports to prohibit Mr. Dawkins from: (1) performing "services in the nature of the services [he] performed for the Company including but not limited to the solicitation, representation or financial management of professional athletes or prospective professional athletes" for any entities "associated with the representation, management, marketing, consulting or other professional  services for professional athletes" (ASM Sports is among a number of entities

specifically named) or (2) working for any person or entity that represents or seeks to represent prospective or current professional basketball or American football players for "contract, marketing or financial services." *Id.* at ¶ 9. This provision does not contain a geographic restriction. Critically, Paragraph 9 contains an express prohibition against providing contract and marketing services – unlike Paragraph 6, which makes no reference whatsoever to contract and marketing services.

In early 2015, after conversations between Mr. Schoeppler and Andy Miller (the founder of ASM Sports), it was agreed that Mr. Dawkins would leave IMA and begin working for ASM Sports. IMA and Mr. Dawkins executed a written agreement amending the Employment Agreement, dated January 15, 2015 (the "Amendment"), to expressly carve out ASM Sports from the restrictions in Paragraph 9 of the Employment Agreement. The Amendment is styled as a letter agreement from Mr. Schoeppler to Mr. Dawkins and states, in relevant part:

> Reference is now made to your employment Agreement dated April 29, 2014, with regard to your future employment by certain other companies, as outlined in Paragraph 9. *We agree to amend Paragraph 9 and delete the reference to ASM Sports. We acknowledge and agree that you are free to perform services on behave [sic] of ASM Sports as otherwise prohibited by Paragraph 9.*

Exhibit B (emphasis added). The Amendment is signed by both Mr. Schoeppler and Mr. Dawkins.

In email correspondence between Mr. Dawkins and Mr. Schoeppler around the time the Amendment was executed, Mr. Schoeppler made clear that the scope of the amended Employment Agreement was only intended to restrict Mr. Dawkins' ability to provide financial advisory services to current or prospective clients of IMA and was not intended to limit Mr. Dawkins' ability to perform traditional sports agency functions like contract and marketing services:

> I [am] releasing ASM from the non compete. You still can't compete with me but

only with respect to players I already have or were solicited and only for the period of the original noncompete which is a maximum 2 years. ***I don't want to be an agent. Andy doesn't want to be a financial advisor. It shouldn't be a problem in any way for anybody.***

Ex. C.

### C.      Mr. Dawkins has not recruited any athletes to ASM Sports since leaving IMA's employ for the purposes of providing financial advisory services.

Since leaving IMA, Mr. Dawkins has not solicited any clients to ASM Sports for the purposes of providing the type of financial advisory services provided by IMA.  Dawkins Declaration at ¶ 4.  Indeed, ASM Sports does not even provide financial advisory services to its clients – which is why IMA was comfortable removing ASM Sports from the non-compete provision.  *Id.* at ¶ 5.  Since leaving IMA, Mr. Dawkins has recruited to ASM Sports two NBA players solely for the purposes of providing contract negotiation and marketing services.  *Id.* at ¶ 4.  Further, Mr. Dawkins has not used any relationships he developed while working for IMA to interfere with IMA's representation of those clients.  Dawkins Declaration at ¶ 6.

### <u>LAW & ARGUMENT</u>

### THE MOTION SHOULD BE GRANTED[1]

The Employment Agreement states that it shall be "interpreted and enforced in accordance with the substantive laws of the State of Ohio."  Ex. A at ¶ 11.  In order to show a breach of contract under Ohio law, IMA must prove four elements: (1) the existence of and terms of an enforceable contract; (2) performance by IMA under the contract; (3) Mr. Dawkins' breach of the contract; and (4) damages or loss caused by the breach.  *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App. 3d 770, 778 (Franklin Ct. App. 2003).

---

[1] Article 27 of the governing Employment Arbitration Rules and Mediation Procedures states that a dispositive motion is appropriate where, as here, it is "likely to succeed and dispose of or narrow the issues in the case."  The Scheduling Order entered in this case calls for dispositive motions to be filed by June 3, 2016.

Mr. Dawkins is entitled to summary judgment on IMA's breach of contract claim for the following separate and independently dispositive reasons: <u>First</u>, Mr. Dawkins did not breach the Employment Agreement because the Amendment expressly allows Mr. Dawkins to work for ASM Sports and to recruit individuals (including current or prospective clients of IMA) to join ASM Sports for the purposes of providing contract and marketing services.  Second, even if this panel determined that the Employment Agreement, as written and amended, restricts Mr. Dawkins' ability to perform contract and marketing services, both the non-solicitation and the non-competition provisions of the Employment Agreement are overbroad and thus unenforceable under Ohio law in any event.  <u>Third</u>, and finally, IMA cannot establish damages.

### A. IMA cannot prove breach because IMA amended the Employment Agreement to permit Mr. Dawkins to work for ASM Sports.

The text of the Employment Agreement and the Amendment, along with the parties' contemporaneous communications, make clear that the Employment Agreement as amended does not prohibit Mr. Dawkins from working for ASM Sports and from providing contract and marketing services to ASM Sports' clients.  The only provision of the Employment Agreement which purports to restrict Mr. Dawkins' ability to provide contract and marketing services appears in Paragraph 9 of the Employment Agreement.  *See* Exhibit A at ¶ 9 ("You agree not to be employed by any persons or companies representing [clients] . . . for contracting, marketing or financial services.").  It is undisputed that the parties, through the Amendment, expressly deleted this provision as it applies to ASM Sports.  *See* Exhibit B ("We acknowledge and agree that you are free to perform services on behave [sic] of ASM Sports as otherwise prohibited by Paragraph 9.").  The only plausible way to read the Amendment is to conclude that the restrictions on Mr. Dawkins' ability to provide contract and marketing services for ASM Sports are completely and entirely removed.

- 7 -

The Amendment states that the restrictions of Paragraph 6 of the Employment Agreement still apply to Mr. Dawkins.  But unlike Paragraph 9, Paragraph 6 contains no reference whatsoever to "contract" and "marketing" services.  Under well-settled principles of contractual interpretation in Ohio, the fact that Paragraph 9 expressly references "contract" and "marketing" services, while Paragraph 6 does not, plainly means that Paragraph 6 does not apply to contract and marketing services.  *See, e.g., Ex parte Bushnell*, 9 Ohio St. 77, 90-91 (1859) ("The express mention of one thing implies the exclusion of things not mentioned."); *Uram v. Uram*, 65 Ohio App. 3d 96, 99 (9th App. Dist. 1989) ("[T]he expression in a contract of one or more things of a class implies the exclusion of all not expressed.").  Thus, the only plausible way to read Paragraph 6 is as a restriction on Mr. Dawkins' ability to recruit then-existing current or potential clients of IMA for the purposes of providing ***financial advisory services*** – the very same services IMA provides to its clients – and not as a restriction on Mr. Dawkins ability to provide contract and marketing services to those same current or potential clients.

This reading is confirmed by Mr. Schoeppler's own words written around the same time the Amendment was agreed to and executed: "I don't want to be an agent.  Andy doesn't want to be a financial advisor.  It shouldn't be a problem in any way for anybody."  Exhibit C.  Moreover, to the extent there is any ambiguity as to whether or not Paragraph 6 prohibits Mr. Dawkins from performing contract or marketing services for potential clients of IMA, the ambiguity should be resolved against IMA, both as the drafter of the Employment Agreement and as the party seeking to broadly construe a non-compete provision. *See, e.g., Uram v. Uram*, 65 Ohio App. 3d 96, 99 (9th App. Dist. 1989); *Westfall v. Estate of Dlesk*, 2015-Ohio-4313 (7th App. Dist. Oct. 13, 2015) ("It is a well-founded principle that we must construe ambiguous contracts against the drafter."); *Willis Refrigeration, Air Conditioning & Heating v. Maynard*,

2000 Ohio App. LEXIS 102, at *19 (12th App. Dist. Jan. 18, 2000) ("It is well-established that as a general rule, restrictive covenants not to compete are disfavored by the law.").

In short, construing the non-compete provisions narrowly and against IMA – as is required under Ohio law – it is clear that the Employment Agreement, as amended, permits Mr. Dawkins (i) to work for ASM Sports and (ii) to recruit to ASM Sports any athletes – including prospective or current clients of IMA – for the purposes of providing contract negotiation and marketing services, but not for purposes of providing financial advisory services that directly compete with IMA.  This is precisely what Mr. Dawkins has done.  IMA has presented no evidence – and cannot present any evidence – to show that Mr. Dawkins has recruited any athletes to ASM Sports for the purposes of providing financial advisory services.  *See, e.g.*, *American, Inc. v. Trebec*, 2007-Ohio-1288 (Ct. App. Mar. 22, 2007) (affirming trial court judgment in favor of employee on breach of contract claim where former employer failed to show, *inter alia*, that former employee solicited any clients once she left employment).   Indeed, as sworn to in the attached Declaration, Mr. Dawkins has never recruited any athletes to ASM Sports for the purposes of providing financial advisory services.  Accordingly, Mr. Dawkins has not breached the Employment Agreement, and IMA's claims fail.

**B. The restrictive covenants contained in the Employment Agreement are unenforceable as a matter of Ohio law.**

Under Ohio law, a restrictive covenant is unenforceable unless the former employer can show by *clear and convincing evidence* that the restrictions imposed by the restrictive covenants (1) are no greater than necessary for the protection of the employer's legitimate business interests, (2) do not impose undue hardship on the employee, and (3) are not injurious to the public.  *Acordia of Ohio, L.L.C. v. Fishel*, 133 Ohio St. 3d 356, 359 (2012); *see also Patio Enclosures, Inc. v. Herbst*, 39 Fed. App'x 964, 968 (6th Cir. 2002) (citing *Raimonde v. Van*

*Vlerah*, 42 Ohio St. 2d 21 (1975)); *Hcct, Inc. v. Walters*, 99 Ohio App. 3d 472, 474 (Ohio Ct. App. 1994) (affirming summary judgment for employee where "(1) the covenants seek to eliminate mere ordinary competition, not unfair competition; (2) the benefit to the employer is disproportional to the detriment to the employee; and (3) in view of appellant's weak interests in enforcing the covenants, the contract is unreasonable and unenforceable.").  In seeking to enforce such a covenant, the former employer has the burden of proving that that restraint is reasonable and the contract valid.  *Arthur Murray Dance Studios of Cleveland v. Witter,* 105 N.E.2d 685, 693 (1952); *Biomedical Innovations, Inc. v. McLaughlin*, 103 Ohio App. 3d 122 (1995).

> In evaluating restrictive covenants, courts should consider the following factors:

> The absence or presence of limitations as to time and space; … whether the employee represents the sole contact with the customer;  whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

*Raimonde*, 42 Ohio St. 2d at 25 (quotation omitted).

Here, even if the non-solicitation and non-compete provisions of the Employment Agreement could plausibly be read to restrict Mr. Dawkins' ability to perform contract and marketing services for clients or prospective clients of IMA, the restrictive covenants contained in Paragraphs 6 and 9 of the Employment Agreement go far beyond what is necessary to protect any legitimate business interest IMA might have, and thus are unenforceable as a matter of Ohio law.

1.    **The non-compete and non-solicitation provisions are unenforceable because they do not protect a legitimate business interest of IMA.**

IMA has no legitimate business interest to enforce non-compete and non-solicitation covenants against Mr. Dawkins that restrict his ability to provide services other than financial advisory services.  In Ohio, courts limit legitimate business interests to (1) preventing the disclosure of the former employer's trade secrets, (2) preventing use of the former employer's proprietary customer information to solicit the former employer's customers, and (3) preventing a former employee from using the skill, experience, personal relationships and training the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business away from the former employer.  *See Brentlinger Enters. v. Curran*, 141 Ohio App. 3d 640, 649 (Franklin Cty. 2001); *American, Inc. v. Trebec*, 2007-Ohio-1288 (8th App. Dist. 2007) (holding no legitimate interest where the former employee did not acquire any trade secrets or confidential information from the plaintiff and the plaintiff did not lose any business from its customer after the former employee left); *Century Bus. Servs., Inc. v. Urban*, 179 Ohio App. 3d 111, 123 (8th App. Dist. 2008).

Here, IMA cannot show a legitimate interest in enforcing the non-compete and non-solicitation provisions.  First, there is no evidence that Mr. Dawkins acquired any of IMA's trade secrets while working for IMA, and IMA's clients and potential clients are well known and can be determined through public sources (e.g. NBA team rosters).  Information that is publicly-available or known in the industry is not "secret" and cannot be afforded trade secret protection or form the basis for a legitimate business interest.  *See, .e.g., Devicor Med. Prods. v. Reed*, 2013 U.S. Dist. LEXIS 45730, at *49 (S.D. Ohio Mar. 29, 2013) (holding the plaintiff failed to demonstrate a likelihood of success on the merits because the former employer did not have a legitimate business interest where the former employee had developed relationships with

customers at former employer, but the evidence showed that the customers were well known across the industry and new employer already had relationships with several of them prior to former employee joining); *R & R Plastics v. F.E. Myers Co.*, 92 Ohio App. 3d 789, 801-02 (Ct. App. 1993) ("Information that is known generally in the industry is not 'secret' and cannot be afforded trade secret protection.") (citations omitted); *National Interstate Ins. Co. v. Perro*, 934 F. Supp. 883, 890-91 (N.D. Ohio 1996) (finding one year covenant with no geographic restrictions unreasonable where former employee did not have access to information outside of six state area, and much of the information deemed confidential by former employer was either publicly available or not sufficiently known by former employee to cause former employer harm).

Moreover, to the extent Mr. Dawkins obtained any trade secrets or confidential information while working for IMA, the confidentiality provision of the Employment Agreement already prohibits Mr. Dawkins from using any of that information. *See, e.g.*, *Brentlinger Enters.*, 141 Ohio App. 3d at 649 (restrictive covenant that purported to restrict competition by an employee who had worked for the employer for less than a year unenforceable, given that the employer's customer list was already protected); *American Building Services, Inc. v. Cohen*, 78 Ohio App. 3d 29, 34 (1992) (finding a non-compete agreement unreasonable where defendant worked for plaintiff only a short period of time and defendant "obtained much of his experience and skill as a salesperson and manager" during his previous employment).

Second, IMA cannot have a legitimate business interest in restricting Mr. Dawkins from engaging in contract negotiation and marketing services because IMA primarily engages in financial advisory services. Ex. C. Any clients solicited by Mr. Dawkins on behalf of ASM Sports were for contract negotiation and marketing services, not financial advisory services. Mr.

Dawkins has not solicited any clients for financial advisory services since leaving IMA. Moreover, the services offered by ASM Sports are not mutually exclusive to IMA's business. NBA players need services offered by *both* companies and, thus, ASM Sports is not a competitor to IMA, as Mr. Schoeppler has acknowledged.  Ex. C.  ("I don't want to be an agent.  Andy doesn't want to be a financial advisor.  It shouldn't be a problem.").  IMA cannot have a legitimate business interest in protecting a scope of services beyond the financial advisory services it provides.  *MP TotalCare Servs. v. Mattimoe*, 648 F. Supp. 2d 956, 964 (N.D. Ohio 2009) (finding restrictive covenant invalid where it purported to prohibit former employee from engaging in business activity outside of the field that former employer engaged in); *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 957 (D. Minn. 1999) (applying Ohio law) (finding provision without parameters on the prohibited activities was not reasonably limited to protect employer's interests).  Accordingly, IMA has no legitimate business interest in preventing Mr. Dawkins from working for ASM Sports or soliciting clients on ASM Sport's behalf.

Finally, there is no evidence that Mr. Dawkins acquired any special skill, experience, personal relationships or training with IMA that he is using to attract clients away from IMA to ASM Sports.  Because IMA does not have a legitimate business interest in restricting Mr. Dawkins from performing any services or soliciting clients other than for financial advisory services, the restrictive covenants contained in Paragraphs 6 and 9 are overbroad and unenforceable.

## 2.      The restrictive covenants are overbroad in time and scope.

In addition, Paragraphs 6 and 9 are unenforceable because they are overbroad in time and scope.   They contain no geographic restriction, and prevent Mr. Dawkins (an employee who was only being paid $50,000) from engaging in his profession for an entire year and soliciting any

client for a two year period.  Ex. A at ¶¶6, 9.  Courts have found similar restrictions to be unreasonable, particularly where unequal bargaining power is involved, as here.  *See, e.g.*, *PolyOne Corp. v. Kutka*, 67 F. Supp. 3d 863, 872 (N.D. Ohio 2014) (restrictive covenant containing a one year ban on employment in any position with any competitor in any location in the country found unreasonable, reasoning that covenant constituted "a total ban on competition itself, producing a disproportionate benefit to the employer to the employee's detriment"); *Cintas Corp. v. Perry*, 517 F.3d 459, 466 (7th Cir. 2008) (applying Ohio law) (finding 2-year, worldwide ban on a uniform company's former sales manager accepting any employment with, consultation for or ownership interest in more than 30 competitors of the former employer unenforceable, where the manager's territory had been limited to only 2 states); *Ma Operating v. Driscoll*, 2010 Ohio Misc. LEXIS 3504, at *9 (Ct. Cmn. Pls. Feb. 2, 2010) (non-competition clause found overbroad and thus unenforceable where it prohibited employee from seeking employment in the industry anywhere in the United States).

For each of these reasons, Paragraphs 6 and 9 of the Employment Agreement are unenforceable and cannot be enforced to prohibit Mr. Dawkins from engaging in non-financial advisory services of the sort engaged in by ASM Sports.  Accordingly, because the restrictive covenants are unenforceable, Mr. Dawkins could not have breached the provisions.

### C.  IMA's breach of contract claim fails as a matter of law because IMA cannot establish damages.

In order to recover on a breach of contract claim, a claimant must demonstrate, *inter alia*, that he has suffered damage or loss resulting from the specific breach.  *Ma Operating*, 2010 Ohio Misc. LEXIS 3504, at *10. "Compensatory damages must be shown with certainty: damages which are merely speculative are not recoverable." *Id*.  Summary judgment to the defendant is appropriate where a claimant fails to provide admissible evidence of economic damages resulting

- 14 -

from an alleged breach of contract. *Id.* (granting summary judgment to the defendant where plaintiff failed to adduce evidence that, inter alia, defendant's actions caused plaintiff to lose clients or revenue); *see also American, Inc. v. Trebec*, 2007-Ohio-1288 (affirming trial court judgment in favor of employee on breach of contract claim where former employer failed to show loss in profits or lost clients). Any clients solicited by Mr. Dawkins on behalf of ASM Sports were for contract negotiation and marketing services, not financial advisory services. Accordingly, IMA has not lost any clients or potential clients and has not suffered any damages.

<u>**CONCLUSION**</u>

For the reasons stated herein, Mr. Dawkins respectfully requests that IMA's claims be dismissed.

Respectfully submitted,

Dated: June 3, 2016

/s/ Colin Jennings
SQUIRE PATTON BOGGS (US) LLP
Colin Jennings (0068704)
colin.jennings@squirepb.com
Sean L. McGrane (0091287)
sean.mcgrane@squirepb.com
4900 Key Tower, 127 Public Square
Cleveland, Ohio 44114
Tel: (216) 479-8538
Fax: (216) 479-8780

*Attorneys for Respondent Christian Dawkins*

# EXHIBIT A

## EMPLOYMENT AGREEMENT

THIS AGREEMENT sets forth certain conditions of your employment with International Management Advisors Ltd., an Ohio limited liability corporation. The following paragraphs constitute the agreement between you (hereinafter referred to as "Employee") and International Management Advisors Ltd. (hereinafter referred to as "Company").

Employee and Company agree as follows:

1.     Term. The term of employment shall be until terminated by either party. Employee agrees to conform to the rules and regulations of Company. Employee understands that the term of employment and compensation can be terminated, with or without cause, at any time by Company or by Employee.

2.     Salary. Employee's starting salary shall be $50,000 per year as agreed payable semi-monthly on the 15th and last day of each month.

3.     Confidentiality. (a) Company recognizes and acknowledges that Employee's services make them privy to personal and confidential matters and information that is or could be of interest to the press or general public because of Company's clientele. As used herein, "Confidential Information" includes all information that is furnished to Employee by Company, all other information gained by Employee about Company in connection with providing services, and the terms of this Agreement. Employee further acknowledges that the disclosure of such information could cause Company extreme personal and economic harm for which an adequate remedy does not exist at law. Employee agrees that the obligations herein in connection with the Confidential Information will continue even after their services have been terminated.

(b)     The Confidential Information will not be used other than in connection with the purpose described above, and will be kept confidential by Employee. Employee will not in any manner disclose the Confidential Information to any person other than as permitted hereby, and Employee agrees that they will use best efforts to safeguard the Confidential Information from unauthorized disclosure. The term "person" as used in this Agreement will be broadly interpreted to include without limitation any individual, corporation, company, partnership or other entity.

(c)     If Employee is requested or required by law or legal process (e.g., by oral question, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, Employee will promptly notify Company of such request or requirement so that Company may seek an appropriate protective order or waive compliance with provisions of this Agreement.

(d)     Any Confidential Information in document form (including photographs) will be provided or returned to Company immediately at its request, and no copies will be retained by Employee. Any Confidential Information not so requested or returned will be held by Employee and kept subject to the terms of this Agreement or destroyed.

(e)     No failure or delay in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

(f)     All rights that Company may have in the Confidential Information, such as copyright, trade secret or similar intellectual property right, will be retained exclusively by Company.  Nothing in this Agreement will be construed as granting any license, waiver or right to Employee with respect to any Confidential Information disclosed under this Agreement.

(g)     Money damages would not be a sufficient remedy for any breach of this Agreement by Employee and Company will be entitled to specific performance and injunctive relief as remedies for any such breach.  Such remedies will not be deemed to be the exclusive remedies for any breach of this Agreement but will be in addition to all other remedies available at law or equity.

4.     <u>Files/Ownership of Creations</u>.  (a)  Employee acknowledges that files, documents and records of any kind relating to Company and Company's business, including materials created by Employee, are the property of Company.  They shall not be removed from Company's offices except as required in the conduct of Company's business, and shall be returned to Company at the termination of Employee's employment.  Company's files, documents and records include files maintained in Company's file rooms, files maintained on Company's computer systems and on personal computers used for Company business, files maintained by company executives, such as chronological files and suspense files, rolodex address files, 3 x 5 card files, information recorded on computer diskettes or other computer information storage media, computer printouts.

(b)  Employee agrees that all creative materials, research, drafts, documents, surveys, source codes, programs, other deliverables and materials prepared by Employee for Company (collectively the "Materials"), will be owned by Company, and that Employee will cooperate with Company to evidence and perfect its rights therein.  Employee acknowledges that all such Materials are works made for hire for Company.  If for any reason any or all of the Material are deemed not to be on a work-for-hire basis, by signing this Agreement, Employee irrevocably assigns to Company all right, title and interest to any materials created by Employee for Company.  Any and all rights relating to the Materials, including all forms and derivatives thereof in all languages and all materials used in preparing the Materials, belong exclusively to Company, throughout the world and in perpetuity.  Company, in its sole discretion, is entitled to dispose of any or all of those rights as it sees fit and is entitled to all proceeds from the disposition of those rights.  Upon request of Company and its expense, Employee agrees to execute and deliver any and all documents or take any other action that Company deems necessary to obtain perfect, enforce or defend any and all copyright, patent, trademark or other intellectual property rights or protections in and to Materials, or otherwise vest in Company ownership of Materials and intellectual property rights thereto throughout the world.

5.  <u>Arbitration</u>.  Unless the resolution of a particular dispute is barred by law, the parties agree to submit to arbitration any dispute related to the employment relationship and agree that the arbitration process shall be the exclusive, final and binding means for resolving disputes which the parties cannot themselves resolve.  Any arbitration hereunder shall be conducted under the Employment Dispute Resolution Rules of the American Arbitration Association ("AAA") as modified herein.  Arbitration proceedings shall take place in Cleveland, Ohio, before a single neutral arbitrator who shall be a lawyer.  All arbitration proceedings shall be confidential.  Neither party shall disclose any information about the evidence produced by the other party in the arbitration proceeding, except in the course of judicial, regulatory, or arbitration proceeding, or as may be demanded by government authority.  Before making any disclosure permitted by the preceding sentence, a party shall give the other party reasonable advance written notice of the intended disclosure and an opportunity to prevent disclosure.  Each party shall have the right to take the deposition of one individual and any expert witness designated by the other party.  Additional discovery may be had only where the arbitrator so orders, upon a showing of substantial need.  Only evidence that is directly relevant to the issues may be obtained in discovery.  Each party bears the burden of persuasion of any claim or counterclaim raised by that party.  The arbitration provisions of this Agreement shall not prevent Company from obtaining injunctive relief from a court of competent jurisdiction to enforce the obligations of Paragraphs 4 and 5 for which Company may obtain provisional relief pending a decision on the merits by the arbitrator.  Employee consents to the jurisdiction of Ohio courts for such purpose.  The arbitrator shall have authority to award any remedy or relief that a court of the State of Ohio or federal court located in the State of Ohio could grant in conformity to applicable law on the basis of claims actually made in the arbitration.  The arbitrator may allow reasonable attorney's fees as a part of the award where the discretion to allow such fees is provided under applicable Ohio or federal law.  Any arbitration award shall be accompanied by a written statement containing a summary of the issues in controversy, a description of the award, and an explanation of the reasons for the award.  The arbitrator's award shall be final and judgment may be entered upon such award by any court.  Employee's share of the administration and arbitrator's fees for the arbitration will be Two Hundred Fifty Dollars ($250.00).  The remainder of the administration and arbitrator's fees will be paid by Company.  Any reference in this clause to Company also refers to all subsidiary and affiliated entities, all benefit plans, sponsors and trustees of benefit plans, fiduciaries, administrators, officers and directors.

This arbitration procedure will be governed by the Federal Arbitration Act as will any actions to compel, enforce, vacate or conform proceedings, awards, orders of the Arbitration or settlement under this procedure.

6.  <u>Representation of Existing and Prospective Clients, Properties, and Customers</u>.  During the Employee's employment with the Company, the Employee will not solicit nor represent any client, property, or customer on behalf of anyone other than the Company.  For the period of two years following the end of Employee's employment with the Company, Employee will not directly or indirectly solicit or represent as a client, on Employee's own behalf or on behalf of another, or be employed by, any person or organization which: (i) was a client of the Company within eighteen months next preceding the end of Employee's employment with the Company and/or was a client with whom Employee had dealings while Employee was associated with the Company or was a client with whom employees reporting to Employee had dealings while Employee was associated with the Company; or (ii) was a prospective client of the Company who was actively solicited as such within the

twelve months next preceding the end of Employee; employment with the Company, and further, Employee or Company employees reporting to Employee, participated in such solicitation.

8.   Company Personnel.  During Employee's employment with the Company and for the twelve months following the end of Employee's employment with the Company, Employee will not directly or indirectly, on Employee's own behalf or on behalf of another, be involved with the hiring of nor be hired by or associated with, any person who was an employee of the Company, or who provided substantial services to the Company at any time during the six months next preceding the end of Employee's employment with the Company.

9.   Restrictions re Certain Companies.  For the twelve month period next following the end of your association with the Company, (regardless of the reason for the end of that association and regardless of whether it was by your choice or that of the Company), you will not, directly or indirectly, perform services in the nature of the services you performed for the Company including but not limited to the solicitation, representation or financial management of professional athletes or prospective professional athletes on behalf of any and all affiliates and/or successors of entities that are, or may be associated with the representation, management, marketing, consulting or other professional services for professional athletes including specifically, but not limited to, Creative Artists Agency, Relativity Sports, ASM Sports, Excel Sports, Wasserman or Priority Sports or any other registered agent with the NBA or NFL Players Associations or any company or affiliate of any company employing NBA or NFL registered agents.   You agree not to be employed by any persons or companies representing or seeking to represent prospective or current professional basketball or American football players for contract, marketing or financial services for the twelve month period next following the end of your association with the company.

10.   Miscellaneous.  (a)  Employee acknowledges and agrees that Employee is free of employment restrictions from former employers and that Employee is not a party to any agreement, the terms of which are inconsistent with the terms of this Agreement, or which would be breached by Employee's services to Company.

(b)   If any provision of this Agreement is found to be unenforceable by reason of being unduly broad or restrictive, then such provision shall be interpreted and enforced to such lesser extent as is not unduly broad or restrictive.

(c)   The provisions of this Agreement shall be deemed to be severable, and the invalidity or unenforceability of any provision shall not affect the validity or unenforceability of any other provision. The breach by the Company of any obligation or duty to Employee shall entitle Employee to their appropriate remedy at law but shall not, of itself, relieve Employee of any other obligation set forth in this Agreement.

(d)   Employee agrees that any breach of this Agreement could cause irreparable harm to Company and that in the event of such breach, Company shall have, in addition to any and all remedies of law, the right to an injunction, specific performance or other equitable relief to prevent any violation of Employees' obligations hereunder.

11.   Choice of Law.  This Agreement, except as provided in Paragraph 5, shall be interpreted and enforced in accordance with the substantive laws of the State of Ohio.

12.   <u>Employee's Right to Consult with Administrative Agencies.</u>  Nothing in this Agreement is meant to foreclose the Employee's right to consult with or cooperate with any governmental agency but Paragraph 6 is meant to provide an arbital forum to finally resolve any work-related claim the Employee may wish to pursue.

13.   <u>Merger.</u>  This Agreement sets forth the entire agreement between Company and Employee with respect to the subject matter, and all negotiations, understandings and prior agreements (whether oral or in writing) are merged herein.  This Agreement may not be changed except by an instrument in writing signed by both parties hereto.

IN WITNESS WHEREOF, Company and Employee have executed this agreement as of the date and year set forth below.

Agreed                                                              International Management Advisors, Ltd.


_____          By:: _____
Christian Vaughn Dawkins                              Name:  Kurt J. Schoeppler
                                                                     Title:   President

<u>Addendum</u>

Notwithstanding anything to the contrary in this agreement, Employee may represent prospective and existing clients of IMA provided that all future gross revenue received by Employee or any future employer, partner or entity associated with Employee, on whose behalf or benefit Employee solicits directly or indirectly or provides services to, a client or prospective client of IMA, will be split 60/40 in favor of IMA.  For the purpose of this addendum "gross revenue" means the future total amount billed invoiced or due from any current or prospective client of IMA for any financial, accounting, investment, insurance, marketing or contract negotiation services.

The purpose of this addendum is to allow Employee to leave IMA and receive 40% of the gross revenue earned from any client or prospective client of IMA who chooses to continue his relationship with Employee or any entity related to Employee (directly or indirectly) for any future services provided by employee, his employer, partner or related entity, after employee is separated from employment with IMA provided that IMA continues to receive 60% of all gross revenue generated from client.

If the future employers of Employee or any related entities, partners or associates of Employee are unwilling or unable to agree to these terms and provide IMA with sufficient guarantee and/or security assuring IMA that such payments of 60% of gross revenue will be made in the future immediately upon their receipts (as determined solely by IMA) then all the non-compete and other restrictions including but not limited to those described in paragraphs 6 and 9 of this agreement will remain in full force and effect and the Employee will be restricted from representing or providing any services to current and prospective clients of IMA.

The arbitration provision of paragraph 5 applies fully to this addendum as well as the injunction rights provided in paragraph 10D.

If this addendum is found to be unenforceable then this agreement shall be interpreted without this addendum.

_____          _4/29/14_____          _____
Christian Vaughn Dawkins              Date                   Kurt Schoeppler

# EXHIBIT B

## TERMINATION OF EMPLOYMENT

## AMENDMENT OF EMPLOYEMENT AGREEMENT REGARDING CERTAIN COMPANIES

Dear Christian,

This letter agreement is intended to acknowledge your termination of employment and your release of any and all claim against IMA effective January 15, 2015.

Reference is now made to your employment agreement dated April 29, 2014, with regard to your future employment by certain other companies, as outlined in Paragraph 9.  We agree to amend Paragraph 9 and delete the reference to ASM Sports.

We acknowledge and agree that you are free to perform services on behave of ASM Sports as otherwise prohibited by Paragraph 9.

The employment agreement, including the restrictions of Paragraph 6, remains in full force and effect with the exception of the deletion of ASM Sports in Paragraph 9.

Sincerely,

Kurt Schoeppler

Agreed:

Christian Vaughn Dawkins

# EXHIBIT C

Begin forwarded message:

> **From:** loydmgmt@gmail.com
> **Date:** July 26, 2015 at 2:42:37 PM GMT-5
> **To:** "J.R. Hensley" <jrhensley@asmsports.com>, Andy Miller <amiller@asmsports.com>
> **Subject: Fwd: Release**

Sent from my iPhone

Begin forwarded message:

> **From:** Kurt Schoeppler <kschoeppler@imagroup.us>
> **Date:** February 22, 2015 at 10:27:21 AM EST
> **To:** "loydmgmt@gmail.com" <loydmgmt@gmail.com>
> **Subject: RE: Release**
>
> Jarrell had a good game.

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------
From: loydmgmt@gmail.com
Date: 02/21/2015 4:47 PM (GMT-05:00)
To: Kurt Schoeppler <kschoeppler@imagroup.us>
Subject: Re: Release

Ok. I'm going to download the document and sign it.

Sent from my iPhone

> On Feb 21, 2015, at 4:36 PM, Kurt Schoeppler <kschoeppler@imagroup.us> wrote:
>
> Christian the Note is really just a tax thing for me.  I'm not planning on collecting that money from you.  I don't expect you will be willing or able to pay.  I am not worried about it.  It will shift some income from me to you.  You will I think be able to offset with deductions that I don't have.  Don't worry about the note as anything else.
>
> I realeasing ASM from the non compete.  You still can't compete with me but only with respect to players I already have or were solicited and only for the period of the original noncompete which is a maximum 2 years.   I don't want to be an agent.  Andy doesn't want to be a financial advisor.  It shouldn't be a problem in any way for anybody.
>
> Kurt
>
> Kurt J. Schoeppler, CPA/CFA
> International Management Advisors, Ltd.
> 1360 East 9th Street, Suite 860
> Cleveland, OH 44114
> Office (216) 436-3637
> Fax (216) 436-3764
>

# EXHIBIT D

# FORM ADV

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS**

| | |
|---|---|
| Primary Business Name: INTERNATIONAL MANAGEMENT ADVISORS LTD. | CRD Number: 140361 |
| Annual Amendment - All Sections | Rev. 10/2012 |
| 4/1/2016 9:49:37 PM | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

## Item 1 Identifying Information

Responses to this Item tell us who you are, where you are doing business, and how we can contact you.

A.   Your full legal name (if you are a sole proprietor, your last, first, and middle names):
   **INTERNATIONAL MANAGEMENT ADVISORS LTD.**

B.   Name under which you primarily conduct your advisory business, if different from Item 1.A.:
   **INTERNATIONAL MANAGEMENT ADVISORS LTD.**

   *List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

C.   If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.), enter the new name and specify whether the name change is of
   ☐ your legal name or ☐ your primary business name:

D.   (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-66765**

   (2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:

E.   If you have a number ("*CRD Number*") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **140361**

   *If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

F.   *Principal Office and Place of Business*

   (1) Address (do not use a P.O. Box):
   Number and Street 1:                               Number and Street 2:
   1360 E. 9TH ST.                                    SUITE 860
   City:                State:            Country:              ZIP+4/Postal Code:
   CLEVELAND            Ohio              United States         44114

   If this address is a private residence, check this box: ☐

   *List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest five offices in terms of numbers of employees.*

   (2) Days of week that you normally conduct business at your *principal office and place of business*:
   ◉ Monday - Friday ○ Other:

   Normal business hours at this location:
   9:00 AM - 5:00 PM
   (3) Telephone number at this location:
   216-436-3555
   (4) Facsimile number at this location:
   216-436-3764

G.   Mailing address, if different from your *principal office and place of business* address:

   Number and Street 1:                               Number and Street 2:
   City:                State:            Country:              ZIP+4/Postal Code:

   If this address is a private residence, check this box: ☐

H.   If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

   Number and Street 1:                               Number and Street 2:
   City:                State:            Country:              ZIP+4/Postal Code:

   | | Yes | No |
   |---|---|---|
   | I.   Do you have one or more websites? | ○ | ◉ |

*If "yes," list all website addresses on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. Some advisers may need to list more than one portal address. Do not provide individual electronic mail (e-mail) addresses in response to this Item.*

J.   Provide the name and contact information of your Chief Compliance Officer: If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

   Name:                                             Other titles, if any:

   Telephone number:                                 Facsimile number:

   Number and Street 1:                              Number and Street 2:

   City:                 State:                       Country:                ZIP+4/Postal Code:

   Electronic mail (e-mail) address, if Chief Compliance Officer has one:

K.   Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

   Name:                                             Titles:

   Telephone number:                                 Facsimile number:

   Number and Street 1:                              Number and Street 2:

   City:                 State:                       Country:                ZIP+4/Postal Code:

   Electronic mail (e-mail) address, if contact person has one:

|  | | **Yes** | **No** |
|---|---|---|---|

L.   Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*?      ○   ⦿

   *If "yes," complete Section 1.L. of Schedule D.*

                                                                                      **Yes**   **No**
M.   Are you registered with a *foreign financial regulatory authority*?      ○   ⦿

   *Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

                                                                                      **Yes**   **No**
N.   Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934?      ○   ⦿

   If "yes," provide your CIK number (Central Index Key number that the SEC assigns to each public reporting company):

                                                                                      **Yes**   **No**
O.   Did you have $1 billion or more in assets on the last day of your most recent fiscal year?      ○   ⦿

P.   Provide your *Legal Entity Identifier* if you have one:

   A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. In the first half of 2011, the *legal entity identifier* standard was still in development. You may not have a *legal entity identifier*.

---

**SECTION 1.B. Other Business Names**

No Information Filed

---

**SECTION 1.F. Other Offices**

No Information Filed

---

**SECTION 1.I. Website Addresses**

No Information Filed

---

**SECTION 1.L. Location of Books and Records**

No Information Filed

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

No Information Filed

---

**Item 2 SEC Registration/Reporting**

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration.

A.   To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). Part 1A Instruction 2 provides information to help you determine whether you may affirmatively respond to each of these items.

You (the adviser):

☑   (1)   are a **large advisory firm** that either:

(a)   has regulatory assets under management of $100 million (in U.S. dollars) or more, or

(b)   has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

☐   (2)   are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

(a)   not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*, or

(b)   not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

*Click **HERE** for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.*

☐   (3)   have your *principal office and place of business* **in Wyoming** (which does not regulate advisers);

☐   (4)   have your *principal office and place of business* **outside the United States**;

☐   (5)   are an **investment adviser (or sub-adviser) to an investment company** registered under the Investment Company Act of 1940;

☐   (6)   are an **investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

☐   (7)   are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

☐   (8)   are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

*If you check this box, complete Section 2.A.(8) of Schedule D.*

☐   (9)   are a **newly formed adviser** relying on rule 203A-2(c) because you expect to be eligible for SEC registration within 120 days;

*If you check this box, complete Section 2.A.(9) of Schedule D.*

☐   (10)   are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

*If you check this box, complete Section 2.A.(10) of Schedule D.*

☐   (11)   are an **Internet adviser** relying on rule 203A-2(e);

☐   (12)   have **received an SEC order** exempting you from the prohibition against registration with the SEC;

*If you check this box, complete Section 2.A.(12) of Schedule D.*

☐   (13)   are **no longer eligible** to remain registered with the SEC.

---

***State Securities Authority Notice Filings** and State Reporting by **Exempt Reporting Advisers***

C.   Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ ID | ☐ MO | ☐ PA |
| ☐ AK | ☐ IL | ☐ MT | ☐ PR |

| | | | |
|---|---|---|---|
| ☐ AZ | ☐ IN | ☐ NE | ☐ RI |
| ☐ AR | ☐ IA | ☐ NV | ☐ SC |
| ☐ CA | ☐ KS | ☐ NH | ☐ SD |
| ☐ CO | ☐ KY | ☐ NJ | ☐ TN |
| ☐ CT | ☐ LA | ☐ NM | ☐ TX |
| ☐ DE | ☐ ME | ☑ NY | ☐ UT |
| ☐ DC | ☐ MD | ☐ NC | ☐ VT |
| ☐ FL | ☐ MA | ☐ ND | ☐ VI |
| ☐ GA | ☐ MI | ☑ OH | ☐ VA |
| ☐ GU | ☐ MN | ☐ OK | ☐ WA |
| ☐ HI | ☐ MS | ☐ OR | ☐ WV |
| | | | ☐ WI |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

---

**SECTION 2.A.(8) Related Adviser**

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser
801 -

---

**SECTION 2.A.(9) Newly Formed Adviser**

If you are relying on rule 203A-2(c), the newly formed adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

---

**SECTION 2.A.(10) Multi-State Adviser**

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

---

**SECTION 2.A.(12) SEC Exemptive *Order***

If you are relying upon an SEC *order* exempting you from the prohibition on registration, provide the following information:

Application Number:
803-

Date of *order*:

A.   How are you organized?

- ○ Corporation
- ○ Sole Proprietorship
- ○ Limited Liability Partnership (LLP)
- ○ Partnership
- ◉ Limited Liability Company (LLC)
- ○ Limited Partnership (LP)
- ○ Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

B.   In what month does your fiscal year end each year?
DECEMBER

C.   Under the laws of what state or country are you organized?

State  Country

Ohio   United States

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

---

**Item 4 Successions**

**Yes No**

A.   Are you, at the time of this filing, succeeding to the business of a registered investment adviser?   ○  ◉

*If "yes", complete Item 4.B. and Section 4 of Schedule D.*

B.   Date of Succession:  (MM/DD/YYYY)

*If you have already reported this succession on a previous Form ADV filing, do not report the succession again. **Instead, check "No." See** Part 1A Instruction 4.*

---

**SECTION 4 Successions**

No Information Filed

---

**Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

*Employees*

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

A.   Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.
2

B.   (1)   Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?
1

(2)   Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?
0

(3)   Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?
0

(4)   Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser*

*representatives* for an investment adviser other than you?

0

(5) Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

0

(6) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

0

*In your response to Item 5.B.(6), do not count any of your employees **and count a firm only once – do not count each of the firm's** employees that solicit on your behalf.*

---

### Clients

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C. (1) To approximately how many *clients* did you provide investment advisory services during your most recently completed fiscal year?

  ○ 0           ○ 1-10           ● 11-25

  ○ 26-100           ○ More than 100
                           If more than 100, how many?
                           (round to the nearest 100)

(2) Approximately what percentage of your *clients* are non-*United States persons*?

10%

D. *For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships. The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, check "None" in response to Item 5.D.(1)(d) and do not check any of the boxes in response to Item 5.D.(2)(d).*

(1) What types of *clients* do you have? Indicate the approximate percentage that each type of *client* comprises of your total number of *clients*. If a *client* fits into more than one category, check all that apply.

| | | None | Up to 10% | 11-25% | 26-50% | 51-75% | 76-99% | 100% |
|---|---|---|---|---|---|---|---|---|
| (a) | Individuals (other than *high net worth individuals*) | ○ | ● | ○ | ○ | ○ | ○ | ○ |
| (b) | *High net worth individuals* | ○ | ○ | ○ | ○ | ○ | ● | ○ |
| (c) | Banking or thrift institutions | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| (d) | Investment companies | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| (e) | Business development companies | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| (f) | Pooled investment vehicles (other than investment companies) | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| (g) | Pension and profit sharing plans (but not the plan participants) | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| (h) | Charitable organizations | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| (i) | Corporations or other businesses not listed above | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| (j) | State or municipal *government entities* | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| (k) | Other investment advisers | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| (l) | Insurance companies | ● | ○ | ○ | ○ | ○ | ○ | ○ |
| (m) | Other: | ● | ○ | ○ | ○ | ○ | ○ | ○ |

(2) Indicate the approximate amount of your regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If a *client* fits into more than one category, check all that apply.

| | | None | Up to 25% | Up to 50% | Up to 75% | >75% |
|---|---|---|---|---|---|---|
| (a) | Individuals (other than *high net worth individuals*) | ○ | ● | ○ | ○ | ○ |
| (b) | *High net worth individuals* | ○ | ○ | ○ | ○ | ● |
| (c) | Banking or thrift institutions | ● | ○ | ○ | ○ | ○ |
| (d) | Investment companies | ● | ○ | ○ | ○ | ○ |
| (e) | Business development companies | ● | ○ | ○ | ○ | ○ |
| (f) | Pooled investment vehicles (other than investment companies) | ● | ○ | ○ | ○ | ○ |
| (g) | Pension and profit sharing plans (but not the plan participants) | ● | ○ | ○ | ○ | ○ |
| (h) | Charitable organizations | ● | ○ | ○ | ○ | ○ |
| (i) | Corporations or other businesses not listed above | ● | ○ | ○ | ○ | ○ |
| (j) | State or municipal *government entities* | ● | ○ | ○ | ○ | ○ |

|  | (k) | Other investment advisers | ⦿ | ○ | ○ | ○ | ○ |
|  | (l) | Insurance companies | ⦿ | ○ | ○ | ○ | ○ |
|  | (m) | Other: | ⦿ | ○ | ○ | ○ | ○ |

## Compensation Arrangements

E.   You are compensated for your investment advisory services by (check all that apply):

- ☑ (1)   A percentage of assets under your management
- ☐ (2)   Hourly charges
- ☐ (3)   Subscription fees (for a newsletter or periodical)
- ☐ (4)   Fixed fees (other than subscription fees)
- ☐ (5)   Commissions
- ☐ (6)   *Performance-based fees*
- ☐ (7)   Other (specify):

---

**Item 5 Information About Your Advisory Business - Regulatory Assets Under Management**

## Regulatory Assets Under Management

**Yes   No**

F.   (1)   Do you provide continuous and regular supervisory or management services to securities portfolios?   ⦿   ○

(2)   If yes, what is the amount of your regulatory assets under management and total number of accounts?

|  | U.S. Dollar Amount | | Total Number of Accounts |
|---|---|---|---|
| Discretionary: | (a)   $ 108,558,968 | (d) | 86 |
| Non-Discretionary: | (b)   $ 0 | (e) | 0 |
| Total: | (c)   $ 108,558,968 | (f) | 86 |

*Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.*

---

**Item 5 Information About Your Advisory Business - Advisory Activities**

## Advisory Activities

G.   What type(s) of advisory services do you provide? Check all that apply.

- ☑ (1)   Financial planning services
- ☑ (2)   Portfolio management for individuals and/or small businesses
- ☐ (3)   Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
- ☐ (4)   Portfolio management for pooled investment vehicles (other than investment companies)
- ☐ (5)   Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
- ☐ (6)   Pension consulting services
- ☐ (7)   Selection of other advisers (including *private fund* managers)
- ☐ (8)   Publication of periodicals or newsletters
- ☐ (9)   Security ratings or pricing services
- ☐ (10)  Market timing services
- ☐ (11)  Educational seminars/workshops
- ☐ (12)  Other(specify):

*Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in Section 5.G.(3) of Schedule D.*

H.   If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- ○   0
- ○   1 - 10
- ⦿   11 - 25
- ○   26 - 50
- ○   51 - 100
- ○   101 - 250
- ○   251 - 500
- ○   More than 500
  If more than 500, how many?
  (round to the nearest 500)

*In your responses to this Item 5.H., do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

I. If you participate in a wrap fee program, do you or any of your related persons:

☐ (1)   *sponsor* the *wrap fee program*?

☐ (2)   act as a portfolio manager for the *wrap fee program*?

*If you are a portfolio manager for a wrap fee program, list the names of the programs and their sponsors in Section 5.I.(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check either Item 5.I.(1) or 5.I.(2).*

|  | Yes | No |
|---|---|---|
| J.   In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments? | ○ | ◉ |

---

### SECTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies

No Information Filed

---

### SECTION 5.I.(2) *Wrap Fee Programs*

No Information Filed

---

### Item 6 Other Business Activities

In this Item, we request information about your firm's other business activities.

A.   You are actively engaged in business as a (check all that apply):

☐ (1)   broker-dealer (registered or unregistered)
☐ (2)   registered representative of a broker-dealer
☐ (3)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐ (4)   futures commission merchant
☐ (5)   real estate broker, dealer, or agent
☑ (6)   insurance broker or agent
☐ (7)   bank (including a separately identifiable department or division of a bank)
☐ (8)   trust company
☐ (9)   registered municipal advisor
☐ (10)  registered security-based swap dealer
☐ (11)  major security-based swap participant
☑ (12)  accountant or accounting firm
☐ (13)  lawyer or law firm
☐ (14)  other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B, complete Section 6.A. of Schedule D.*

|  | Yes | No |
|---|---|---|
| B.   (1)   Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ◉ |
| (2)   If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

|  | Yes | No |
|---|---|---|
| (3)   Do you sell products or provide services other than investment advice to your advisory *clients*? | ◉ | ○ |

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

---

### SECTION 6.A. Names of Your Other Businesses

No Information Filed

---

### SECTION 6.B.(2) Description of Primary Business

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

---

### SECTION 6.B.(3) Description of Other Products and Services

Describe other products or services you sell to your *client*. You may omit products and services that you listed in Section 6.B.(2) above.

LIFE INSURANCE

If you engage in that business under a different name, provide that name.

---

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A.  This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

- [ ] (1)  broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
- [ ] (2)  other investment adviser (including financial planners)
- [ ] (3)  registered municipal advisor
- [ ] (4)  registered security-based swap dealer
- [ ] (5)  major security-based swap participant
- [ ] (6)  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- [ ] (7)  futures commission merchant
- [ ] (8)  banking or thrift institution
- [ ] (9)  trust company
- [ ] (10) accountant or accounting firm
- [ ] (11) lawyer or law firm
- [ ] (12) insurance company or agency
- [ ] (13) pension consultant
- [ ] (14) real estate broker or dealer
- [ ] (15) sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
- [ ] (16) sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206-2-(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

---

**SECTION 7.A. Financial Industry Affiliations**

No Information Filed

---

**Item 7 *Private Fund* Reporting**

|  | **Yes** | **No** |
|---|---|---|
| B.  Are you an adviser to any *private fund*? | ○ | ◉ |

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If another adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

---

**SECTION 7.B.(1) *Private Fund* Reporting**

No Information Filed

---

**SECTION 7.B.(2) *Private Fund* Reporting**

**Item 8 Participation or Interest in *Client* Transactions**

In this Item, we request information about your participation and interest in your *clients*' transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

**Proprietary Interest in *Client* Transactions**

| | | Yes | No |
|---|---|---|---|
| A. | Do you or any *related person*: | | |
| (1) | buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)? | ○ | ◉ |
| (2) | buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? | ○ | ◉ |
| (3) | recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A.(1) or (2))? | ○ | ◉ |

**Sales Interest in *Client* Transactions**

| | | Yes | No |
|---|---|---|---|
| B. | Do you or any *related person*: | | |
| (1) | as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? | ○ | ◉ |
| (2) | recommend purchase of securities to advisory *clients* for which you or any *related person* serves as underwriter, general or managing partner, or purchaser representative? | ○ | ◉ |
| (3) | recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? | ○ | ◉ |

**Investment or Brokerage Discretion**

| | | Yes | No |
|---|---|---|---|
| C. | Do you or any *related person* have *discretionary authority* to determine the: | | |
| (1) | securities to be bought or sold for a *client's* account? | ◉ | ○ |
| (2) | amount of securities to be bought or sold for a *client's* account? | ◉ | ○ |
| (3) | broker or dealer to be used for a purchase or sale of securities for a *client's* account? | ○ | ◉ |
| (4) | commission rates to be paid to a broker or dealer for a *client's* securities transactions? | ○ | ◉ |
| D. | If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*? | ○ | ○ |
| E. | Do you or any *related person* recommend brokers or dealers to *clients*? | ◉ | ○ |
| F. | If you answer "yes" to E above, are any of the brokers or dealers *related persons*? | ○ | ◉ |
| G. (1) | Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party ("soft dollar benefits") in connection with *client* securities transactions? | ○ | ◉ |
| (2) | If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under section 28(e) of the Securities Exchange Act of 1934? | ○ | ○ |
| H. | Do you or any *related person*, directly or indirectly, compensate any *person* for *client* referrals? | ○ | ◉ |
| I. | Do you or any *related person*, directly or indirectly, receive compensation from any *person* for *client* referrals? | ○ | ◉ |

*In responding to Items 8.H and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H) or received from (in answering Item 8.I) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

**Item 9 Custody**

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

| | | Yes | No |
|---|---|---|---|
| A. (1) | Do you have *custody* of any advisory *clients'*: | | |
| (a) | cash or bank accounts? | ◉ | ○ |
| (b) | securities? | ○ | ◉ |

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-(2)(d)(5)) from the related person.*

(2)   If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody*:

U.S. Dollar Amount

(a)  $ 65,317,745

Total Number of *Clients*

(b) 22

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your **clients'** accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

B.   (1)   In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients*':   **Yes   No**

(a)  cash or bank accounts?   ○ ⦿

(b)  securities?   ○ ⦿

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2)   If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which your *related persons* have *custody*:

U.S. Dollar Amount

(a)  $

Total Number of *Clients*

(b)

C.   If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

(1)   A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage.   ☐

(2)   An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial statements are distributed to the investors in the pools.   ☐

(3)   An *independent public accountant* conducts an annual surprise examination of *client* funds and securities.   ☑

(4)   An *independent public accountant* prepares an internal control report with respect to custodial services when you or your *related persons* are qualified custodians for *client* funds and securities.   ☐

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in Section 9.C. of Schedule D if you already provided this information with respect to the private funds you advise in Section 7.B.(1) of Schedule D).*

D.   Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?   **Yes   No**

(1)   you act as a qualified custodian   ○ ⦿

(2)   your *related person(s)* act as qualified custodian(s)   ○ ⦿

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in Section 7.A. of Schedule D, regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E.   If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YYYY) the examination commenced:
09/2015

F.   If you or your *related persons* have *custody* of *client* funds or securities, how many persons, including, but not limited to, you and your *related persons*, act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?
0

---

**SECTION 9.C. *Independent Public Accountant***

You must complete the following information for each *independent public accountant* engaged to perform a surprise examination, perform an audit of a pooled investment vehicle that you manage, or prepare an internal control report. You must complete a separate Schedule D Section 9.C. for each *independent public accountant*.

(1)   Name of the *independent public accountant*:
COHEN FUND AUDIT SERVICES, LTD.

(2)   The location of the *independent public accountant's* office responsible for the services provided:

Number and Street 1:
800 WESTPOINT PARKWAY

Number and Street 2:
SUITE 1100

City:                     State:                     Country:                     ZIP+4/Postal Code:

Yes No

(3) Is the *independent public accountant* registered with the Public Company Accounting Oversight Board?    ⦿ ○

(4) If yes to (3) above, is the *independent public accountant* subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?    ⦿ ○

(5) The *independent public accountant* is engaged to:

    A. ☐ audit a pooled investment vehicle

    B. ☑ perform a surprise examination of *clients'* assets

    C. ☐ prepare an internal control report

(6) Does any report prepared by the *independent public accountant* that audited the pooled investment vehicle or that examined internal controls contain an unqualified opinion?

    ○ Yes

    ○ No

    ○ Report Not Yet Received

*If you check "Report Not Yet Received", you must promptly file an amendment to your Form ADV to update your response when the accountant's report is available.*

---

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

Yes No

A. Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies?    ○ ⦿

    *If yes, complete Section 10.A. of Schedule D.*

B. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

---

**SECTION 10.A. *Control Persons***

No Information Filed

---

**SECTION 10.B. Control Person Public Reporting Companies**

No Information Filed

---

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed: you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

Yes No

Do any of the events below involve you or any of your *supervised persons*?    ○ ⦿

For "yes" answers to the following questions, complete a Criminal Action DRP:

A.  In the past ten years, have you or any *advisory affiliate*:

    (1)  been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*?    ○ Yes  ◉ No

    (2)  been *charged* with any *felony*?    ○ Yes  ◉ No

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

B.  In the past ten years, have you or any *advisory affiliate*:

    (1)  been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses?    ○ Yes  ◉ No

    (2)  been *charged* with a *misdemeanor* listed in Item 11.B.(1)?    ○ Yes  ◉ No

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

---

For "yes" answers to the following questions, complete a Regulatory Action DRP:

C.  Has the SEC or the Commodity Futures Trading Commission (CFTC) ever:    **Yes No**

    (1)  *found* you or any *advisory affiliate* to have made a false statement or omission?    ○ ◉

    (2)  *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes?    ○ ◉

    (3)  *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted?    ○ ◉

    (4)  entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity?    ○ ◉

    (5)  imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity?    ○ ◉

D.  Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*:

    (1)  ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical?    ○ ◉

    (2)  ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes?    ○ ◉

    (3)  ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted?    ○ ◉

    (4)  in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity?    ○ ◉

    (5)  ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity?    ○ ◉

E.  Has any *self-regulatory organization* or commodities exchange ever:

    (1)  *found* you or any *advisory affiliate* to have made a false statement or omission?    ○ ◉

    (2)  *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)?    ○ ◉

    (3)  *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted?    ○ ◉

    (4)  disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities?    ○ ◉

F.  Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended?    ○ ◉

G.  Are you or any *advisory affiliate* now the subject of any regulatory proceeding that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.?    ○ ◉

---

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

H.  (1)  Has any domestic or foreign court:    **Yes No**

        (a)  in the past ten years, enjoined you or any *advisory affiliate* in connection with any *investment-related* activity?    ○ ◉

        (b)  ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations?    ○ ◉

        (c)  ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*?    ○ ◉

    (2)  Are you or any *advisory affiliate* now the subject of any civil proceeding that could result in a "yes" answer to any part of Item 11.H.(1)?    ○ ◉

---

## Item 12 Small Businesses

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to *control* the other *person*.

| | Yes | No |
|---|---|---|
| A. Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |

*If "yes," you do not need to answer Items 12.B. and 12.C.*

B. Do you:

(1) *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? ○ ○

(2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? ○ ○

C. Are you:

(1) *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? ○ ○

(2) *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? ○ ○

---

## Schedule A

**Direct Owners and Executive Officers**

1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.

2. Direct Owners and Executive Officers. List below the names of:

   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;

   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act):
   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (c) if you are organized as a partnership, <u>all</u> general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;

   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and

   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.

3. Do you have any indirect owners to be reported on Schedule B?   ○ Yes   ⦿ No

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.

5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:   NA - less than 5%   B - 10% but less than 25%   D - 50% but less than 75%
   A - 5% but less than 10%   C - 25% but less than 50%   E - 75% or more

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Status | Date Status Acquired MM/YYYY | Ownership Code | Control Person | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| SCHOEPPLER, KURT, JAY | I | SOLE MEMBER/CHIEF COMPLIANCE OFFICER | 04/2006 | E | Y | N | 4660796 |

---

## Schedule B

**Indirect Owners**

1. Complete Schedule B only if you are submitting an initial application. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation:

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital:

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:     C - 25% but less than 50%     E - 75% or more
                            D - 50% but less than 75%     F - Other (general partner, trustee, or elected manager)

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

No Information Filed

---

**Schedule D - Miscellaneous**

You may use the space below to explain a response to an Item or to provide any other information.

---

**DRP Pages**

**CRIMINAL DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

---

**Part 2**

**Exemption from brochure delivery requirements for SEC-registered advisers**

SEC rules exempt SEC-registered advisers from delivering a firm brochure to some kinds of clients.  If these exemptions excuse you from delivering a brochure to *all* of your advisory clients, you do not have to prepare a brochure.

                                                                                          **Yes  No**

Are you exempt from delivering a brochure to all of your clients under these rules?         ○    ⊙

*If no, complete the ADV Part 2 filing below.*

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 117243 | ADV PART 2 | High net worth individuals |

**Execution Pages**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

## Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature: | Date: MM/DD/YYYY |
| KURT J SCHOEPPLER | 03/30/2016 |
| Printed Name: | Title: |
| KURT J SCHOEPPLER | PRESIDENT |
| Adviser *CRD* Number: | |
| 140361 | |

**_NON-RESIDENT_ INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

## 1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

## 2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

## 3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both

certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature: _____                    Date: MM/DD/YYYY

Printed Name: _____                 Title:

Adviser *CRD* Number:
140361